RECORD NO 14-1329

# In The
# United States Court of Appeals
# For The Fourth Circuit

**CALLA WRIGHT; WILLIE J. BETHEL; AMY T. LEE; AMYGAYLE L. WOMBLE; JOHN G. VANDENBERGH; BARBARA VANDENBERGH; AJAMU G. DILLAHUNT; ELAINE E. DILLAHUNT; LUCINDA H. MACKETHAN; WILLIAM B. CLIFFORD; ANN LONG CAMPBELL; GREG FLYNN; BEVERLY S. CLARK; CONCERNED CITIZENS FOR AFRICAN-AMERICAN CHILDREN d/b/a Coalition of Concerned Citizens for African-American Children; RALEIGH WAKE CITIZENS ASSOCIATION,**

Plaintiffs-Appellants,

v.

**STATE OF NORTH CAROLINA;
WAKE COUNTY BOARD OF ELECTIONS,**

Defendants-Appellees.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH**
_____

**BRIEF OF APPELLEES**
_____

Scott W. Warren
Roger A. Askew
Claire A. Hunter
Post Office Box 550
Raleigh, North Carolina 27602
Phone (919) 856-5500
Roger.Askew@wakegov.com

*Counsel for Appellee Wake County
Board of Elections*

Alexander M. Peters
N.C. Department of Justice
114 West Edenton Street
Post Office Box 629
Raleigh, North Carolina 27602
Phone (919) 716-6900
APeters@ncdoj.gov

*Counsel for Appellee State of
North Carolina*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                               YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                                   YES      NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    _____
(signature)    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1329__        Caption: __Wright v. State of North Carolina__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__State of North Carolina__
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Alexander McC. Peters _____    Date: _____ April 11, 2014 _____

Counsel for: State of North Carolina _____

## CERTIFICATE OF SERVICE
**************************

I certify that on ____ April 11, 2014 ____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Allison Jean Riggs                          Kenneth R. Murphy, III
SOUTHERN COALITION FOR SOCIAL JUSTICE       Scott Wood Warren
Suite 101, 1415 West Highway 54             WAKE COUNTY ATTORNEY'S OFFICE
Durham, NC 27707                            P. O. Box 550
                                            Raleigh, NC 27602

/s/Alexander McC. Peters _____    _____ April 11, 2014 _____
        (signature)                                  (date)

- 2 -

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE.................................................................1

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT ........................................................................................7

I.    THE DISTRICT COURT PROPERLY FOUND THAT
      PLAINTIFFS HAVE FAILED TO STATE A *PRIMA FACIE*
      ONE PERSON, ONE VOTE CLAIM BECAUSE THE
      POPULATION DEVIATIONS BETWEEN THE
      CHALLENGED DISTICTS ARE *dE MINIMIS*...........................7

      A.    The Supreme Court Has Established a 10% d*e Minimis*
            Benchmark for Population Deviation in Electoral
            Districts. ...........................................................................7

      B.    Plaintiffs' Complaint Establishes on Its Face that the
            Population Deviations in the Challenged Districts Are
            Within the Supreme Court's 10% *de Minimis* Rule, and
            that the New Districting Plan Is Neither Arbitrary Nor
            Discriminatory...................................................................9

      C.    Plaintiffs' Complaint Establishes On Its Face that the
            Population Deviations in the Challenged Districts Are Also
            Within the *de Minimis* Rule Announced by the North
            Carolina Supreme Court....................................................12

II.    THE DISTRICT COURT DID NOT COMMIT ERROR WHEN
       IT DISMISSED THE COMPLAINT ON THE GROUNDS THAT
       THE FACTS ALLEGED BY PLAINTIFFS' RAISED A
       NONJUSTICIABLE    POLITICAL    GERRYMANDERING
       CLAIM COUCHED AS A ONE PERSON, ONE VOTE CLAIM. .............14

       A.    Plaintiffs' Complaint Alleges No More than a Political
             Gerrymandering Claim.......................................................................14

       B.    Political Gerrymandering Claims Are Nonjusticiable for
             Lack of a Judicially Manageable Standard to Resolve Such
             Claims...............................................................................................17

III.   THE DISTRICT COURT PROPERLY DETERMINED THAT
       PLAINTIFFS' PROPOSED AMENDMENT WAS FUTILE. .....................23

CONCLUSION ...........................................................................................................29

REQUEST FOR ORAL ARGUMENT ....................................................................29

CERTIFICATE OF COMPLIANCE ........................................................................31

CERTIFICATE OF SERVICE .................................................................................32

## TABLE OF AUTHORITIES

CASES

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ....................................................19

*Avery v. Midland County*, 390 U.S. 474 (1968) ........................................8

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................... *passim*

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) ........................... 14, 15

*Board of Estimate v. Morris*, 489 U.S. 688 (1989) .....................................9

*Brown v. Thomson*, 462 U.S. 835 (1983) ......................................... 8, 9, 10

*California v. Deep Sea Research*, 523 U.S. 491 (1998) ..........................................24

*Chapman v. Meier*, 420 U.S. 1 (1975) ....................................................28

*Connor v. Finch*, 431 U.S. 407 (1977) ....................................................9

*Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996) ........................................... 4, 10, 11, 17

*Davis v. Bandemer,* 478 U.S. 109 (1986) ...........................................17, 20

*Ex parte Young*, 209 U.S. 123 (1908) ................................................... 6, 24, 25, 26

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ............................................... 11, 12, 18

*Hans v. Louisiana*, 134 U.S. 1 (1890) ....................................................24

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997) .........................................24, 26

*Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006) ....................................................24

*Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd*
  *Cox v. Larios*, 542 U.S. 947 (2004).............................................................. 22, 23

*Miller v. Johnson,* 515 U.S. 900 (1995)...................................................18

*Perkins v. United States*, 55 F.3d 910 (4th Cir. 1995) ........................................ 6, 24

*Perry v. Perez*, 181 L. Ed. 2d 900 (2012) ...............................................28

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................ 4, 8, 11, 17

*Roman v. Sincock*, 377 U.S. 695 (1964) ........................................... 11, 12

*Shaw v. Reno,* 509 U.S. 630 (1993) ........................................................18

*Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002) ..................... 8, 12, 13

*Swierkiewicz v. Sorema,* 534 U.S. 506 (2002)...........................................15

*Vieth v. Jubelirer,* 541 U.S. 267 (2004) ........................................... *passim*

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ...............................................9

*Wesberry v. Sanders,* 376 U.S. 1 (1964)...................................................17

*Whitcomb v. Chavis*, 403 U.S. 124 (1971)...............................................28

## CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

28 U.S.C. § 1367.........................................................................................7

42 U.S.C. § 1983.........................................................................................2

N.C. Const. art. I, § 4 ..............................................................................18

N.C. Const. art. I, § 6 ..............................................................................26

N.C. Const. art. I, § 19 ........................................................................ 3, 7, 13

N.C. Const. art. II, § 22(6) ......................................................................27

N.C. Gen. Stat. § 163-22(a) (2013).........................................................27

N.C. Gen. Stat. § 163-22(c) (2013).........................................................27

N.C. Gen. Stat. § 163-33 (2013) ................................................................27

2013 N.C. Sess. Laws 110 ..........................................................*passim*

Fed. R. Civ. P. 12(b)(6) (2013) ..................................................3, 12, 14

## STATEMENT OF THE ISSUES

I.    DID THE DISTRICT COURT PROPERLY FIND THAT PLAINTIFFS HAVE FAILED TO STATE A *PRIMA FACIE* ONE PERSON, ONE VOTE CLAIM BECAUSE THE POPULATION DEVIATIONS BETWEEN THE CHALLENGED DISTICTS ARE *dE MINIMIS*?

II.    DID THE DISTRICT COURT COMMIT ERROR WHEN IT DISMISSED THE COMPLAINT ON THE GROUNDS THAT THE FACTS ALLEGED BY PLAINTIFFS' RAISED A NONJUSTICIABLE "POLITICAL GERRYMANDERING" CLAIM COUCHED AS A "ONE PERSON, ONE VOTE" CLAIM?

III.    DID THE DISTRICT COURT PROPERLY DETERMINE THAT PLAINTIFFS' PROPOSED AMENDMENT WAS FUTILE?

## STATEMENT OF THE CASE

Thirteen individual citizens of Wake County, North Carolina and two associations of citizens (collectively "plaintiffs") initiated this action by filing a "Complaint—Equitable Relief Sought" on August 22, 2013.  [J.A. 10 *et seq.*[1]] Through that Complaint, plaintiffs challenged 2013 N.C. Sess. Laws 110 ("S.L. 2013-110"), a local bill enacted by the North Carolina General Assembly that altered the method and timing of how members of the Wake County Board of Education are elected and redrew the Board's districts from nine (9) numbered districts to seven (7) numbered districts and two (2) lettered districts.  Under the

---

[1]  References to the Joint Appendix refer to pagination as it appears in the bottom right corner of pages in the Joint Appendix, shown as "USCA4 __."  These are the page numbers as they appear in the index to the Joint Appendix.

old plan, Wake County voters had one choice in Board of Education elections, but under the new plan each voter will have two (2) choices—they will choose a candidate in their numbered district and in their lettered district.

The legislation plaintiffs have challenged was passed following a rather tumultuous political climate on the Board. This occurred in 2009 following the election of a majority of "candidates favoring conservative education policies" who began "dismantling the school system's 10-year-old socioeconomic diversity policy" in favor of a neighborhood based school assignment policy. [J.A. 17, ¶¶ 28 & 29]

In 2011, following the 2010 decennial census, the Wake County Board of Education redistricted itself.  [J.A. 18–20, ¶¶ 32–39]  The 2011 elections later that year ushered out the former majority with a new majority of Democrats returning to the board.  These new board members all ran on "promises of recommitting to socioeconomic policy."   [J.A. 18, ¶ 30]   While the elections are officially nonpartisan, the Complaint readily references party affiliation.

On 13 March 2013, Senate Bill 325 was introduced in the General Assembly.  [J.A. 21, ¶ 40]  On 13 June 2013, S.B. 325 was ratified as S.L. 2013-110.  [J.A. 21, ¶ 43]

Plaintiffs' Complaint purports to assert claims under 42 U.S.C. § 1983 for defendants' alleged violation of plaintiffs' equal protection rights under both the

United States and North Carolina Constitutions resulting from the North Carolina General Assembly's enactment of S.L. 2013-110.  [J.A. 11–12, ¶ 2]  Plaintiffs' Complaint seeks "relief in the form of a declaratory judgment and a preliminary, mandatory injunction requiring the Defendants to conduct lawful elections for the Wake County Board of Education using an election method and districting system which complies with the requirement of the Fourteenth Amendment to the United States Constitution and Article I, § 19 of the North Carolina Constitution."  [J.A. 11–12, ¶ 2]

Defendants answered the Complaint and filed separate Motions to Dismiss plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).  [J.A. 33–51]  Included in the Motion to Dismiss of the State of North Carolina was the defense that the action against the State was barred by the Eleventh Amendment to the United States Constitution. [J.A. 36–38]  In response to this motion, plaintiffs filed a Motion for Leave to Amend Complaint, by which they would substitute Governor Patrick McCrory, President *Pro Tempore* of the North Carolina Senate Phillip Berger and Speaker of the North Carolina House of Representatives Thomas Tillis, each in his official capacity, as defendants in place of the State of North Carolina.  [J.A. 52–56]

On 17 March 2014, the district court issued its order and judgment, by which it denied the Motion for Leave to Amend Complaint on the grounds that the

3

proposed amendment was futile and then dismissed plaintiffs' claims. [J.A. 81–93] Plaintiffs Notice of Appeal was timely filed on 7 April 2014. [J.A. 95–96]

Additional relevant facts are discussed below.

## SUMMARY OF ARGUMENT

This challenge to S.L. 2013-110 has at its foundation a claim that the population deviations in the new districts were violative of one person, one vote equal protection principles enunciated by *Reynolds v. Sims*, 377 U.S. 533 (1964), and its progeny. Plaintiffs correctly cite selected portions of this landmark case in their brief, including the holding that divergences from a strict population standard are constitutionally permissible if based on legitimate considerations incident to the effectuation of a rational state policy. However, the Complaint revealed that the population deviations of the new districts were below 10% and ranged from 7.11% for the numbered districts to 9.8% for the lettered districts. With no *prima facie* case, plaintiffs must allege and show that the legislation was tainted with arbitrariness or discrimination as required by *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996), in order to prevail on their claims. Plaintiffs failed to so allege.

The factual basis underpinning plaintiffs' claim that S.L. 2013-110 is discriminatory or arbitrary are their allegations that S.L. 2013-110 was an effort of the Republican-controlled General Assembly, led by Republican Senators Chad Barefoot and Neal Hunt, to "disfavor incumbents who are registered Democrats

4

and support progressive education policies" and "further Republican interests and advance conservative agenda policies." [J.A. 28, ¶¶ 62, 66] In other words, plaintiffs' claims of arbitrariness and discrimination are based on their allegations that S.L. 2013-110 was a product of politics, contrived in the throes of a contentious political battle for control of the Board of Education. This, plaintiffs urge, supports their claim that the new redistricting plan was arbitrary or discriminatory, allowing them to survive the motion to dismiss. The district court correctly concluded it was not.

With a complaint void of allegations establishing a *prima facie* case of one person, one vote violation and relying solely on allegations of political motives behind the enactment of the challenged legislation, plaintiffs' are left with nothing more than a lawsuit predicated upon assertions of political gerrymandering. Such claims present a nonjusticiable political question. *See Vieth v. Jubelirer,* 541 U.S. 267, 290 (2004)*; Baker v. Carr*, 369 U.S. 186, 217 (1962). Plaintiffs' claims, then, were properly dismissed by the district court.

The district court also properly denied plaintiffs' Motion for Leave to Amend Complaint. [J.A. 52–56] Plaintiffs sought to amend their complaint so as to avoid dismissal by substituting Governor Patrick McCrory, President *Pro Tempore* of the North Carolina Senate Phillip Berger and Speaker of the North Carolina House of Representatives Thomas Tillis, each in his official capacity, as

5

defendants in place of the State of North Carolina, which had asserted Eleventh Amendment Immunity. [J.A. 52-56] As the district court determined, plaintiffs' proposed amendment would be futile because under the holding of *Ex parte Young*, 209 U.S. 123 (1908), the proposed new parties "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Id.* at 157. None of the new defendants proposed by plaintiffs have any connection with the enforcement of S.L. 2013-110.

Moreover, even if the proposed parties could be substituted as defendants, plaintiffs still failed to state claims for which relief could be granted. This being so, even had the court allowed the amendment, the amendment would not have saved plaintiffs' claims from dismissal. Accordingly, the district court properly found that the proposed amendment was futile. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (amendment is futile if the amended claim would fail to survive motion to dismiss).

## ARGUMENT

**I.   THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS HAVE FAILED TO STATE A *PRIMA FACIE* ONE PERSON, ONE VOTE CLAIM BECAUSE THE POPULATION DEVIATIONS BETWEEN THE CHALLENGED DISTICTS ARE d*E MINIMIS*.**

### A.   The Supreme Court Has Established a 10% d*e Minimis* Benchmark for Population Deviation in Electoral Districts.

Plaintiffs' Complaint states two claims for relief.  First, plaintiffs claim that "[b]y creating an election system that unjustifiably weights the vote of some voters in the county much more heavily than the vote of other voters in the county, S.L. 2013–110 completely and fundamentally violates the one-person, one-vote requirement established by the Fourteenth Amendment."  [J.A. 29, ¶ 72]  Second, plaintiffs claim that "[b]y creating an election system that unjustifiably weights the vote of some voters in the county much more heavily than the vote of other voters in the county, S.L. 2013–110 completely and fundamentally violates the demands of the state constitution that each voter be treated equally."[2] [J.A. 30, ¶ 79]  The district court properly found that plaintiffs failed to make a *prima facie* case on these claims, which must therefore fail as a matter of law.  The court correctly found that, because the population deviations that plaintiffs claim are

---

[2]   By their second claim, which is based on the Article I, § 19, of the North Carolina Constitution, plaintiffs appear to have attempted to invoke the district court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Nowhere in their Complaint, however, did they actually assert 28 U.S.C. § 1367 as a basis for jurisdiction.

unconstitutional fall within the limits repeatedly held to be *de minimis* by the federal courts, as well as by the North Carolina Supreme Court, and because plaintiffs have failed to show arbitrariness or discrimination, these claims should be dismissed.

In *Baker v. Carr*, 369 U.S. 186 (1962), *Reynolds v. Sims*, 377 U.S. 533 (1964), and their progeny, the Supreme Court ruled that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that districts for the United States House of Representatives and for state legislatures must achieve "some measure of population equality." *Stephenson v. Bartlett*, 355 N.C. 354, 363, 562 S.E.2d 377, 384 (2002). In *Avery v. Midland County*, 390 U.S. 474, 480–81 (1968), the Supreme Court made clear that the one person, one vote rule also applies to districts of local government.

The Supreme Court has been clear, however, that the one person, one vote requirement of the Fourteenth Amendment does not require absolute equality of population between legislative or local governmental districts, holding that

> minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State.

*Brown v. Thomson*, 462 U.S. 835, 842-843 (1983) (citations and quotation marks omitted).  *See also Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *Connor v. Finch*, 431 U.S. 407, 418 (1977).  "Maximum deviation" is calculated by first dividing the total population of a political unit (such as Wake County) by the total number of districts into which the unit is divided, yielding the population of an "ideal district."[3]   A determination is then made as to how much the actual population of each district varies from the population of the ideal district; this deviation is expressed as a percentage of the ideal population.  Maximum deviation is the sum of the deviation of the district with the smallest population and that of the district with the largest population. *See Board of Estimate v. Morris*, 489 U.S. 688, 700 & n.7 (1989).  This 10% *de minimis* rule remains the benchmark for whether population deviations in electoral districts are so great as to establish a *prima facie* case of violation of the one person, one vote rule.

      **B.**    **Plaintiffs' Complaint Establishes on Its Face that the Population Deviations in the Challenged Districts Are Within the Supreme Court's 10% *de Minimis* Rule, and that the New Districting Plan Is Neither Arbitrary Nor Discriminatory.**

In the instant case, the districts created by the challenged law fall into two groups.  The first group consists of the seven single-member districts that are numbered 1–7.  The second group consists of two single-member districts

---

[3] This assumes that districts are, as is the case here, single-member districts.

(designated as "A" and "B") that plaintiffs refer to as "super-districts." [J.A. 21, ¶ 45] By plaintiffs' allegations, the most-populated of the seven "numbered" districts (District 3) has a population deviation of +3.63%, while the least-populated of the seven numbered districts (District 2) has a population deviation of -4.19%. [J.A. 26, ¶¶ 54 and 55] Plaintiffs allege this yields a maximum deviation in the numbered districts of 7.11%. [J.A. 26, ¶ 53] This deviation is within the Supreme Court's 10% *de minimis* rule.[4]

Likewise, plaintiffs allege the larger of the two "super-districts" has a population deviation of +4.90%, while the smaller of the two districts has a population deviation of -4.90%. [J.A. 26, ¶ 54] This yields a maximum deviation of 9.8%, which is again within the 10% *de minimis* rule. [J.A. 26, ¶ 53] It is clear, then, that plaintiffs have failed to state a *prima facie* case for violation of the Fourteenth Amendment's one person, one vote requirement.

It is true that this Court has held that

The 10% *de minimis* threshold recognized in *Brown* does not completely insulate a state's districting plan from attack of any type. Instead, that level serves as the determining point for allocating the burden of proof in a one person, one vote case. A maximum deviation of greater than 10% automatically establishes a *prima facie* violation of the one person, one vote principle. If the plaintiff establishes this level of disparity in population among the districts, the burden of proof shifts to the state to justify the deviations by showing a rational and legitimate state policy for the districts.

---

[4] Defendants' calculations yield a 7.68% total deviation for the numbered districts. This, however, is also well within the 10% *de minimis* rule.

On the other hand, if the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a "taint of arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. [695,] 710 [(1964)]. In other words, for deviations below 10%, the state is entitled to a presumption that the apportionment plan was the result of an "honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. at 577. However, this is a rebuttable presumption.

*Daly*, 93 F.3d at 1220. As recognized by the district court, however, this does not help plaintiffs.

In their Complaint, plaintiffs allege two reasons why they contend the challenged districts impermissibly violate the one person, one vote rule. First, plaintiffs allege that the Wake County Board of Education had previously adopted new districts with smaller deviations from the ideal population. [J.A. 18–20, ¶¶ 31-39] The Supreme Court, however, has expressly rejected the argument that the possibility of drafting a "better" plan alone is sufficient to establish a violation of the one person, one vote requirement:

We think that appellees' showing of numerical deviations from population equality among the Senate and House districts in this case failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment, whether those deviations are considered alone or in combination with the additional fact that another plan could be conceived with lower deviations among the State's legislative districts.

*Gaffney v. Cummings*, 412 U.S. 735, 740-41 (1973). Especially given that the plan previously adopted by the Wake County Board of Education differed in substance from the plan enacted in S.L. 2013–110 in that it consisted of nine districts for which each voter had one vote, rather than seven districts and two "super-districts" for which each voter has two votes, the mere fact that the previous plan had smaller deviations is totally insufficient to even suggest a "taint of arbitrariness or discrimination." *Roman*, 377 U.S. at 710.

The second reason plaintiffs give for why they allege the challenged districts are impermissible is essentially that their design was politically motivated. [J.A. 21, 27–28, ¶¶ 40, 44, 61–66] Assuming, as the Court must for the purposes of a Rule 12(b)(6) motion, that these allegations are true, this presents a question of political gerrymandering. That is a question the district court properly determined the courts may not consider, as shown in Argument II, *infra*.

    **C.**    **Plaintiffs' Complaint Establishes On Its Face that the Population Deviations in the Challenged Districts Are Also Within the *de Minimis* Rule Announced by the North Carolina Supreme Court.**

Plaintiffs' second cause of action is similar to their first, but is predicated on the North Carolina Constitution. The *de minimis* deviation rule announced by the North Carolina Supreme Court differs slightly from that adopted by the United States Supreme Court. In *Stephenson*, the North Carolina Supreme Court adopted a plus or minus 5% deviation requirement. 355 N.C. at 383, 562 S.E.2d at 397 ("In

forming new legislative districts, any deviation from the ideal population for a legislative district shall be at or within plus or minus five percent for purposes of compliance with federal 'one-person, one-vote' requirements."). Whether this is intended to restate the federal rule or is intended to announce a rule particular to North Carolina is irrelevant for the purposes of the instant case.

In the instant case, plaintiffs allege that the deviations of the challenged districts are all within plus or minus 5%. Specifically, plaintiffs allege that the maximum deviations are +3.63% and -4.19% for the numbered districts, and +4.90% and -4.90% for the lettered districts. [J.A. 26, ¶¶ 54 and 55] Just has plaintiffs have failed to state a *prima facie* case for violation of the Equal Protection Clause of the Fourteenth Amendment, then, they have also failed to state a *prima facie* case for denial of Equal Protection under Article I, § 19, of the North Carolina Constitution. As a result, the district court properly determined that plaintiffs' claims under the North Carolina Constitution also amount to a claim of impermissible political bias, which the federal courts may not entertain. *See* Argument II, *infra*. For that reason, the district court properly dismissed this claim.

13

II.    **THE DISTRICT COURT DID NOT COMMIT ERROR WHEN IT DISMISSED THE COMPLAINT ON THE GROUNDS THAT THE FACTS ALLEGED BY PLAINTIFFS' RAISED A NONJUSTICIABLE POLITICAL GERRYMANDERING CLAIM COUCHED AS A ONE PERSON, ONE VOTE CLAIM.**

A.    **Plaintiffs' Complaint Alleges No More than a Political Gerrymandering Claim.**

Plaintiffs argue in their brief that the district court erred when it found that their Complaint failed to state a claim on the grounds that the claims raised therein amounted to "a partisan gerrymandering claim dressed in one-person one-vote clothing." [Appellants' Br. at 19]  Plaintiffs argue that the district court dismissed a claim that was not brought in their lawsuit and did not allow them to proceed on the claim they did bring. This argument fails because a thorough review of the Complaint reveals that while plaintiffs do utilize formulaic recitations and legal suppositions containing all of the "talismanic" nomenclature found in one person, one vote jurisprudence, in actuality the essence of the lawsuit is a political dispute between differing political groups and apparently differing social and educational philosophies.

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Once a claim for relief has been

14

stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* at 563 (citing *Swierkiewicz v. Sorema,* 534 U.S. 506, 514 (2002)). In the case *sub judice*, plaintiffs' stated cause of action was not internally consistent with the facts surrounding the "dispute" and plaintiffs were attempting to force a one person, one vote square peg into a political question round hole.

Against this backdrop, a court looks to the factual allegations of the complaint and assumes they are true. First, plaintiffs allege that the effect and intent of the challenged law, S.L. 2013-110, is "to disfavor incumbents who are registered Democrats and support progressive education policies." [J.A. 28, ¶ 62] Plaintiffs further allege that, given the new districting plan enacted in S.L. 2013-110, those incumbents favoring "progressive education policies" will find themselves in "Republican-leading districts" with "conservative incumbents" [J.A. 28, ¶ 62], and "[t]he only goal that the new plan accomplishes is to further Republican interests and advance conservative agenda policies[.]" [J.A. 28, ¶ 66] As a result, plaintiffs contend they will be harmed based on their allegation that S.L. 2013-110 will place voters in two of the county's nine school board districts on unequal footing with voters in the other seven districts. [J.A. 28, ¶¶ 62-66]

However, the Complaint's allegations concerning the new plan's supposed impact on incumbents who are registered with a certain political party and who

15

support certain education policies over others is where plaintiffs' stated cause of action (one person, one vote) and the facts supporting that claim diverge and become inconsistent. As noted *supra*, plaintiffs' Complaint alleges that the design of the challenged school board districts was politically motivated. Political motivation simply does not present courts with a question they may consider. Recognizing this, the district court properly dismissed plaintiffs' claims.

The Supreme Court has set forth six independent tests—the presence of any of which indicates the existence of a nonjusticiable political question. In *Baker*, the Court enunciated the factors to consider when assessing whether a case raises a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. In this case, plaintiffs' mischaractization of their case as a one person, one vote case when it was actually a political gerrymandering claim implicates the second *Baker* "political question" test, revealing "a lack of judicially discoverable and manageable standards for resolving" plaintiffs' claims, and thus

the presence of a nonjusticiable political question in the allegations of plaintiffs'

Complaint. *Id*.

Here, plaintiffs did not allege facts to support the claim that the redistricting

plan "had a taint of arbitrariness or discrimination." *Daly*, 93 F.3d at 1220. As the

district court correctly noted, plaintiffs did not allege facts to support arbitrariness

or discrimination but instead alleged facts to show that the General Assembly drew

districts to further one political party's advantage in the electoral process at the

school board level. [J.A. 88]

### B.    Political Gerrymandering Claims Are Nonjusticiable for Lack of a Judicially Manageable Standard to Resolve Such Claims.

In *Vieth v. Jubelirer,* 541 U.S. 267 (2004), the United States Supreme Court

overruled an earlier decision in *Davis v. Bandemer,* 478 U.S. 109 (1986), and held

that "political gerrymandering claims are nonjusticiable and that *Bandemer* was

wrongly decided." The Supreme Court has made clear that one person, one vote

considerations are totally separate from political gerrymander questions.

> Our one-person, one-vote cases, *see Reynolds v. Sims,* 377 U.S. 533 (1964); *Wesberry v. Sanders,* 376 U.S. 1 (1964), have no bearing upon this question, neither in principle nor in practicality. Not in principle, because to say that each individual must have an equal say in the selection of representatives, and hence that a majority of individuals must have a majority say, is not at all to say that each discernable group, whether farmers or urban dwellers or political parties, must have representation equivalent to its numbers.

*Vieth*, 541 U.S. at 290.

17

In the instant case, plaintiffs allege that the intent of the redistricting plan is clear: "to disfavor incumbents who are registered Democrats and support progressive education policies." [J.A. 28, ¶ 62] Plaintiffs' Complaint thus alleges the existence of a "predominant intent" by the legislature to disadvantage the plaintiffs' identified political group, similar to the argument proffered by the appellants in *Vieth*. However, "the [United States] Constitution clearly contemplates districting by political entities, *see* Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics." *Vieth* at 285 (citing *Miller v. Johnson,* 515 U.S. 900, 914 (1995)). "[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition." *Miller*, 515 U.S. at 914. As Justice White stated in his dissent in *Shaw v. Reno,* "districting inevitably is the expression of interest group politics." 509 U.S. 630, 662 (1993). "The reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney,* 412 U.S. at 753.

Given that the *Vieth* Court characterized the "predominant intent to achieve partisan advantage" standard as vague and misapplied in the political gerrymandering context, as well as its recognition of the inevitability of political interests affecting the districting process, plaintiffs' allegation that S.L. 2013-110 unconstitutionally denies them equal protection because the "intent" of S.L. 2013-

18

110 is to disfavor a certain political group must fail as a matter of law. *Vieth*, 541 U.S. at 284.

Plaintiffs further allege that "[t]he only goal that the new plan accomplishes is to further Republican interests and advance conservative agenda policies—over the wishes of the Wake County electorate," and contends that, under federal jurisprudence, this goal is not a "legitimate state interest" lending justification to the deviation in population. [J.A. 28, ¶ 66] Plaintiffs' allegations on what federal jurisprudence does or does not say are conclusory, and as such they are not entitled to an assumption of truth, *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). Actions of a politically elected body that attempts to further "Republican interests and advance conservative agenda policies—over the wishes of the Wake County electorate" [J.A. 28, ¶ 66]—succinctly encapsulates the essence of the political process. In elections, someone wins and someone loses.

Plaintiffs contend that the effect of this legislation makes clear its intent. The *Vieth* Court addressed the imperfections with the "effects" prong of the appellants' proposed standard in that case. The *Vieth* Court noted that unlike a person's race, a person's political affiliation is not an "immutable characteristic," but one that may shift from election to election and perhaps even within an election. *Vieth*, 541 U.S. at 287. Consequently, "it [is] impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to

craft a remedy." *Id.* (quoting *Bandemer*, 478 U.S. at 156). The *Vieth* Court further

noted that even if such effects can be determined

> [T]his standard rests upon the principle that groups (or at least
> political action groups) have a right to proportional representation.
> But the Constitution contains no such principle. It guarantees equal
> protection of the law to persons, not equal representation in
> government to equivalently sized groups. It nowhere says that
> farmers or urban dwellers, Christian fundamentalists or Jews,
> Republicans or Democrats, must be accorded political strength
> proportionate to their numbers.

541 U.S. at 288.

Plaintiffs do not allege that the redistricting plan of S.L. 2013-110

inordinately cuts a suspect class out of the political process. They do not allege

discrimination against a suspect class or a group of persons with immutable

characteristics. Indeed, they do not allege any plausible constitutional infirmity

with the restricting plan. What they do say, however, is that the plan pits

neighborhood school supporters against socioeconomic diversity assignment

supporters. They do allege the redistricting plan favors those with conservative

polices over others favoring "progressive education policies." The do allege that

the plan pits urban voters against rural voters.

Plaintiffs here allege that those Wake County voters favoring "progressive

education policies" must be accorded political strength proportionate to their

numbers, with the school board districts being drawn accordingly. [J.A. 28, ¶ 62]

Plaintiffs allege that they "will suffer immediate harm from having to participate

on an unequal footing in an election system that deprives them of equal representation on the Board of Education." [J.A. 28, ¶ 67]

As discussed above, because political affiliation can change within and between elections—as can groups with particular student assignment philosophies—the effects of political gerrymandering are nearly impossible to determine. In a winner-take-all district system, there are no guarantees no matter how the lines are drawn. Furthermore, "[w]hether by reason of partisan districting or not, party constituents may always wind up 'packed' in some districts and 'cracked' throughout others." *Vieth*, 541 U.S. at 289. In addition,

> [T]o say that each individual must have an equal say in the selection of representatives, and hence that a majority of individuals must have a majority say is not at all to say that each discernable group, whether farmers or urban dwellers or political parties, must have representation equivalent to its numbers.

*Id.* at 290.

Like the appellants in *Vieth,* plaintiffs' "intent" and ""effects" allegations regarding the new districting plan enacted by S.L. 2013-110 are neither judicially discernible nor manageable. *Id.* at 290. Plaintiffs' Complaint thus reveals on its face "a lack of judicially discoverable and manageable standards for resolving" the claims contained therein—and thus the presence of a nonjusticiable political question in its allegations. *Baker*, 369 U.S. at 217; *Vieth*, 541 U.S. at 281.

Plaintiffs' reliance on *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd Cox v. Larios*, 542 U.S. 947 (2004), is unavailing. The issue in *Larios* was not simply that a redistricting pitted the political interests of urban voters against the political interests of rural voters, as plaintiffs have alleged is the case here. Rather, in *Larios* the three-judge court found that a plan that "allow[ed] rural southern Georgia and inner-city Atlanta to maintain their legislative influence even as their rate of population growth lags behind that of the rest of the state" was unconstitutional because it "allow[ed] the people of certain geographic regions of a state to hold legislative power to a degree disproportionate to their population." *Larios*, 300 F.Supp.2d at 1338. In other words, as the Supreme Court stated, the plan was designed "to give an electoral advantage to certain regions of the State," *Larios*, 542 U.S. at 949, even when their comparative populations did not support them having as high a degree of influence. Such a scheme in 147-district and 56-district plans for an entire state is not the same as what this case presents: a plan containing 7 districts and 2 super-districts for a county that is, plaintiffs allege, designed to favor a political group. As noted by the district court, "[t]he broad geographic differences found within a state are not found within one county." [J.A. 89] Likewise, drawing systematic distinctions between urban and rural areas in a statewide plan has far different consequences from drawing distinctions between

political groups that may correlate with urban and rural areas in a county plan. The district court properly found that *Larios* is not dispositive of this case.[5]

The plaintiffs' interpretation of the facts and the law would ensure a lawsuit after every election. The district court properly recognized that every allegation in the Complaint upon which plaintiffs' rely to make this case actionable as an arbitrary or discriminatory act of the legislature leads back, unsurprisingly, to politics. Thus, plaintiffs' remedy, if any, must be found at the ballot box and not at the courthouse.

## III.   THE DISTRICT COURT PROPERLY DETERMINED THAT PLAINTIFFS' PROPOSED AMENDMENT WAS FUTILE.

In the proceedings below, the State of North Carolina moved to dismiss all claims against it on the basis of Eleventh Amendment immunity. [J.A. 36–38] Apparently recognizing and conceding that all claims against the State of North Carolina were indeed subject to dismissal on that basis, plaintiffs moved to amend their Complaint to substitute Governor Patrick McCrory, President *Pro Tempore* of the North Carolina Senate Phillip Berger and Speaker of the North Carolina House of Representatives Thomas Tillis, each in his official capacity, as defendants in

---

[5]   The other factor present in *Larios* that led the courts to find the plan unconstitutional—the protection of some Democratic incumbents but not all incumbents for reasons other than limiting contests between incumbents—is not an issue in this case.

place of the State of North Carolina. The district court properly recognized the futility of the proposed amendment.

As plaintiffs argue and as the district court recognized, "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (*en banc*) (citations and quotations omitted). A proposed amendment is futile if it would not survive a motion to dismiss or for summary judgment. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (amendment is futile if the amended claim would fail to survive motion to dismiss). Here, there is no doubt that plaintiffs' proposed amendment was futile.

Plaintiffs' claim against the State of North Carolina was clearly subject to dismissal under the Eleventh Amendment. *See California v. Deep Sea Research*, 523 U.S. 491, 501, (1998). *See also*, *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997); *Hans v. Louisiana*, 134 U.S. 1 (1890). Implicitly acknowledging this to be the case, plaintiffs sought to replace the State of North Carolina as a defendant with the Governor of North Carolina, the President *Pro Tempore* of the North Carolina Senate and the Speaker of the House of Representatives, each in his official capacity. In moving for this amendment, plaintiffs relied on the holding in *Ex parte Young*, 209 U.S. 123 (1908). Contrary to plaintiffs' assertions, however,

24

*Ex parte Young* makes clear that the state officials plaintiffs sought to substitute as defendants would not be proper parties to this case.

*Ex parte Young*, of course, provides a mechanism by which federal courts have allowed suits against state actors so as to enjoin unconstitutional state action without running afoul of the Eleventh Amendment. 209 U.S. at 159–60. It is clear, however, that any such state actor must have some connection to the enforcement of the act to be enjoined.

> In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party.

> It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed (154 U.S. 362, 366, § 19 of the act), but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious. *The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists*.

*Ex parte Young*, 209 U.S. at 157 (emphasis added). In other words, it does not matter whether the statute at issue specifically imposes a duty of enforcement on the state official or whether some duty of enforcement arises from the general law; the state official "must have some connection with the enforcement of the act, or else [naming him as a defendant] is merely making him a party as a representative

of the State, and thereby attempting to make the State a party." *Id*. Here, plaintiffs have not shown that the Governor of North Carolina, the President *Pro Tempore* of the North Carolina Senate or the Speaker of the House of Representatives have *any* connection with the enforcement of S.L. 2013-110.[6]

It is telling that plaintiffs do not describe a single way in which any of the three state officials they sought to make defendants in this action have even the slightest connection with the enforcement of the legislation they challenge. At most, they assert that *the General Assembly* enacted the statute. [Appellants' Br. at 44] None of the three proposed new defendants are the General Assembly, nor can any of them act for the General Assembly. President *Pro Tempore* Berger and Speaker Tillis are members of the General Assembly. While they have certain duties and obligations as presiding officers of the two chambers in the General Assembly, neither has any authority to enact laws on behalf of the General Assembly. The General Assembly is, of course, the legislative branch of government—its task is to enact laws, not to enforce them. Pursuant to the constitutionally-mandated separation of powers, *see* N.C. CONST. art. I, § 6, the role of enforcement falls to the executive branch.

---

[6]    Likewise, plaintiffs have not shown that there is "no state forum available to vindicate federal interests" with regard to their claims or that this case "case calls for the interpretation of federal law." *Coeur d'Alene Tribe*, 521 U.S. at 270, 274. Such showings are necessary for application of the *Ex parte Young* doctrine. *Id*.

That does not mean, however, that it falls to the governor. Governor McCrory has no connection of any kind to the challenged legislation. As S.L. 2013-110 was a local bill, it did not require Governor McCrory's signature to become law. *See* N.C. CONST. art. II, § 22(6); J.A. 21, ¶ 43. It is the Wake County Board of Elections, which is supervised by the State Board of Elections, that is required to execute the provisions of S.L. 2013-110. *See* N.C. Gen. Stat. § 163-22(a) & -33. The State Board of Elections, not the Governor, appoints the members of the Wake County Board of Elections. *See* N.C. GEN. STAT. § 163-22(c). It is difficult, therefore, to ascertain what connection at all Governor McCrory has to the enforcement of S.L. 2013-110.

Plaintiffs do cite a number of cases where the governor or members of the legislature have been named as parties. These examples are unavailing, however. Plaintiffs do not examine whether questions were raised in those cases as to whether members of the legislature or governors were proper parties, especially in cases where other, appropriate defendants were also named. Nor do they examine whether cases from states other than North Carolina may have relied on laws or procedures specific to those states that would make legislators or a governor proper parties. At best, plaintiffs have only shown that governors and legislators have been named as defendants in cases in the past, not that they have been named as *proper* defendants.

Plaintiffs also confuse the well-established rule that if a redistricting plan is found to be unconstitutional, a court must first allow the legislative body that passed the law an opportunity to remedy the violation, *see Perry v. Perez*, 181 L. Ed. 2d 900 (2012); *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971), with the apparent notion that a court can either enjoin a state legislature (through only two of its members, no less) both to prevent the enforcement of the plan struck down and to mandate the enactment of a new plan. There simply is no support for such an argument.

Plaintiffs also are wrong in their assertion that if the Governor of North Carolina, the President *Pro Tempore* of the North Carolina Senate and the Speaker of the House of Representatives are not defendants, they will not be able to receive complete relief.  A court can enjoin the Wake County Board of Elections from implementing S.L. 2013-110.  Should such an injunction issue, the General Assembly would of course take notice; in the unlikely event that the General Assembly failed to act to provide a new plan for upcoming elections, then the court could adopt a plan for the next election.

Finally, even if the Governor of North Carolina, the President *Pro Tempore* of the North Carolina Senate or the Speaker of the House of Representatives were proper parties in this action, plaintiffs' proposed amendment would still be futile, because plaintiffs did not seek to amend their substantive claims.  As shown in

Arguments I and II, *supra*, and as determined by the district court, plaintiffs failed to state claims for which relief can be granted.  This would not have changed had plaintiffs" Motion for Leave to Amend Complaint been allowed.

For these reasons, the district court properly found that plaintiffs' proposed amendment was futile.

## CONCLUSION

For the foregoing reasons and authorities, defendants, the State of North Carolina and the Wake County Board of Elections, respectfully request that the order and judgment of the district court be affirmed in all respects.

## REQUEST FOR ORAL ARGUMENT

The Appellees agree with the Appellant that Oral Argument would aid in the decisional process and Appellees thereby request oral argument.

Respectfully submitted this the 30th day of June, 2014.

ROY COOPER
ATTORNEY GENERAL

*/s/ Alexander McC. Peters*
Alexander McC. Peters
Senior Deputy Attorney General (NCSB 13654)
E-mail: apeters@ncdoj.gov

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for the State of North Carolina*

29

*/s/ Scott W. Warren*
Scott W. Warren
Wake County Attorney (NCSB 14349)
E-mail: swarren@wakegov.com

*s/ Roger A. Askew*
Roger A. Asken
Deputy Wake County Attorney (NCSB 18081)
E-mail: Roger.Askew@wakegov.com

*/s/ Claire A. Hunter*
Claire A. Hunter
Assistant Wake County Attorney (NCSB 26573)
E-mail: Claire.Hunter@wakegov.com

Office of the Wake County Attorney
Post Office Box 550
Raleigh, North Carolina 27602
Phone: (919) 856-5500
Fax:     (919) 856-5504
*Counsel for the Wake County Board of Elections*

# CERTIFICATE OF COMPLIANCE

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 14-1329          Caption: <u>Calla Wright, *et al* vs. State of North Carolina, *et al*</u>

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)

We hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because :

1. [ X ]   this brief contains 7009 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   [   ]    this brief uses a monospaced typeface and contains [       ] lines of text, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

We hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because:

2. [ X ] this brief has been prepared in a proportionally spaced typeface using Microsoft WORD 2010 in 14 point Times New Roman font; or

   [   ] this brief has been prepared in monospaced typeface using [ n/a]

Dated:  June 30, 2014.          By:    */s/ Roger A. Askew*
                                       Roger A. Askew

Dated:  June 30, 2014.          By:    */s/ Alexander McC. Peters*
                                       Alexander McC. Peters

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on June 30, 2014, I electronically filed the foregoing **BRIEF OF APPELLEES**, which will serve electronic copies to counsel for appellants listed below and, I hereby further certify that pursuant to Local Rule 31(d) of the Fourth Circuit the undersigned caused eight (8) paper copies of this brief to be filed with the Clerk of this Court:

Anita S. Earls
Allison Riggs
Clare R. Barnett
Southern Coalition for Social Justice
1415 West Highway 54, Suite 101
Durham, North Carolina 27707

This the 30th day of June 2014.

*/s/ Alexander McC. Peters*
Alexander McC. Peters
Senior Deputy Attorney General
Post Office Box 550
Raleigh, North Carolina 27602
Phone: (919) 716-6900